# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 20CV1580

IIT, Inc., a Colorado corporation, and
ABAS ABDI, an individual,

      Plaintiffs,

v.

COMMUNICATIONS DISTRIBUTORS, LLC,
a Colorado limited liability company;
IDT CORPORATION, a Delaware corporation; and
ROBERT DIETER, an individual,

      Defendants.

---

## COMPLAINT

---

Plaintiffs, IIT, Inc. ("IIT") and Abas Abdi ("Mr. Abdi") (together, "Plaintiffs"), through their attorneys, WILLIAMS LLP, submit their Complaint against Defendant Communications Distributors, LLC ("CDI"); IDT Corporation ("IDT") and Robert Dieter ("Dieter") (collectively "Defendants") as follows:

## I.      INTRODUCTION AND NATURE OF THE ACTION

1.      IDT Corporation and CDI hired Plaintiffs to build a network of retailers so that  IDT Corporation and CDI could sell  their service to those retailers. The retailers IDT Corporation and CDI marketed generally owned by immigrants. Plaintiffs developed more than 700 retailers  for IDT and CDI.  For many years, the business relationship between Plaintiffs, IDT and CDI worked: Plaintiffs located retailers who could sell IDT and CDI's Service and IDT and CDI paid Plaintiffs for their service.  However, around 2018, IDT and CDI schemed to remove Plaintiffs from the sales process.  Consistent with this Plan, IDT and CDI converted implementing a plan that that sought to remove Plaintiff from the sales stole the retainers from Plaintiffs, refused to pay Plaintiff amounts due to Plaintiff, and bankrupt Plaintiffs' business.

2.      (the "Service") as a telephonic service  to call family members in their home country, recruited Mr. Abdi, an African immigrant  from Somalia, and his company, IIT, to distribute the Service and build the African market by entering into a Master Distributor Agreement (the "Agreement").  Defendants told Mr. Abdi he would receive significant commissions for selling the Service to retailers, that he could have the entire African market in Colorado and other

states, and that he would receive commissions from leads he generated that ultimately purchased the Service. IIT excelled at distributing the Service and developed a significant Distributor's Network of over 950 retailers and individual sellers, all with corresponding customer accounts. In 2016, IIT generated $4.4 million in annual revenues and earned more than $225,000.00 in commissions per year.

3.   After developing a significant African market for Defendants, Defendants began a scheme to steal IIT's Distributor's Network and put IIT out of business. Among other things, Defendants removed more than 950 retailers, and the corresponding customers, from IIT's Distributor's Network; called upon IIT's retailers and convinced them to open new accounts, preventing IIT from receiving the agreed-to commissions from those accounts; threatened IIT and Mr. Abdi with lawsuits if they called upon its retailers or moved those retailers to a company with a product similar to the Service; and in the October 2018, intentionally and willfully breached the Agreement by terminating it and withheld IIT's earned commissions. Defendants, Dieter and CDI, has withheld and continues to withhold commissions earned, vested, and determinable that are due to Mr. Abdi without Mr. Abdi's authorization or permission.

4.     Mr. Abdi and IIT bring claims against Defendants for damages, including the destruction of IIT's business, resulting from their intentional breaches of the Agreement; tortious interference with contracts and business expectancies; violations of state and federal antitrust laws; violations of Mr. Abdi's equal rights; and promissory estoppel. They also seek declaratory judgment, and they demand an accounting from Dieter, CDI, and IDT Corporation.

## II.     THE PARTIES, JURISDICITON, AND VENUE

### A.     The Parties

1.     IIT is a Colorado corporation established under the laws of the State of Colorado with a principal office street address of 1602 S. Parker Road, Unit 112, Denver, Colorado 80231

2.     IIT is a distribution business that sells and supplies prepaid mobile telephone and international calling products to retail stores for resale to consumers, allowing consumers to inexpensively call family and friends in their home countries.

3.     Mr. Abdi, resides in Denver, Colorado.  He is originally from Somalia and owns IIT.  English is not Mr. Abdi's first language.  His native language is Somali.

4.      CDI, a Colorado limited liability company with a principal office street address of 14405 W. Colfax Ave., #251, Lakewood, CO 80401, is a distributor of "BOSS Revolution Services" (also referred to as the "Service") a mobile telephone service that a separate company, IDT Corporation ("IDT"), a Delaware Corporation, developed, owns, and manages the Service. Upon information and belief, CDI and IDT are parties to one or more agreements allowing and authorizing CDI to develop and manage a distribution network for the Service.

5.      Robert Dieter owns and manages CDI. Dieter has an

**B.**    <u>**Jurisdiction and Venue**</u>

6.      This Court has jurisdiction over Plaintiffs' claims pursuant to 15 U.S.C. § 4, 28 U.S.C. §§ 1331, 1337, 1343, 2201, and 2202.  Jurisdiction is also proper in pursuant to Fed. R. Civ. P. 57.

7.      An actual justiciable controversy exists between Plaintiffs and Defendants under 28 U.S.C. § 2201 regarding whether certain provisions of the Agreement between Plaintiffs and Defendants are unenforceable.

8.       This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as Plaintiffs' state law claims arise from the same case facts and controversy as the claim for which this Court has original jurisdiction.

9.      Venue is proper in the District of Colorado under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims set forth in this Complaint occurred in Colorado.  Venue is also proper in the District of Colorado under the Agreement the parties executed.

## III.    GENERAL ALLEGATIONS

## A.    <u>The Master Distribution Agreement</u>

10.      Although IDT developed the Service, it needed help to distribute the Service to generate revenue.  IDT contracted with CDI to distribute the Service, which allowed CDI to enter into contracts with other distributors to  distribute the Service.

11.      IDT and CDI, motivated to generate significant revenue for their companies, targeted customers from foreign countries living in the U.S. who had family in their home countries.

12.      CDI and IDT specifically focused on generating revenue from African immigrants living in the U.S. who has relatives back in Africa. . CDI and IDT  knew they needed Africans to distribute the Service to build the African market.

13.      With that objective in mind, CDI and IDT targeted Africans like Mr. Abdi, in part, because (cultural connection) Mr. Abdi speaks various languages, to distribute the Service by convincing them they would receive commissions for

selling the Service to retailers who were located in areas with significant African customers.

14.     CDI owner Dieter told Mr. Abdi that he was looking to sign up distributors who could build markets with foreign customers in the U.S. to sell the Service.  Dieter told Mr. Abdi that he could have the entire African market in Colorado and in other states and that if he sold the Service, he would be paid a commission on all of his sales and any leads he generated who purchased the Service.  Dieter also told Mr. Abdi that if he opened leads for the Service in other states, a distributor would be selected for that state, but would fall under Mr. Abdi's  Distributor's Network, Mr. Abdi would manage those distributors and Mr. Abdi would receive commissions off of their sales.

15.     Mr. Dieter recruited Mr. Abdi specifically to build a market with black African customers, including U.S. residents from Somalia, to whom he could sell the Service.

16.     On or about April 6, 2012, IIT, Mr. Abdi, and CDI entered into a Master Distribution Agreement (the "Agreement") that permitted and authorized CDI to offer the "Service" through IIT's distribution channel. The Agreement is attached hereto as **Exhibit A**.

17.     English is not Mr. Abdi's first language, and Mr. Dieter knew English is not Mr. Abdi's first language. Mr. Abdi entered into the Agreement without the benefit of obtaining legal advice.

18.     The Agreement described IIT's distribution responsibilities as follows:

> Subject to the terms of this Agreement, IDT and CDI hereby authorize Distributor [*i.e.,* IIT] to promote, market, distribute and sell the Service to Retailers. Distributor shall use its best efforts to promote, market[,] and distribute the Service to Retailers. Distributor is solely responsible for selecting potential Retailers. CDI may, for good cause, decline to provide the Service, to a selected Retailer. . . .

(Agreement ¶ 2.)

19.     The Agreement set forth: (i) specific discount rates at which CDI and IDT would provide the Service to IIT to distribute to retailers, and (ii) a specific range of discounts IIT could in turn distribute the Service to retailers. (Agreement ¶¶ 4.1, 4.2, 4.4.)[1]

---

[1] IDT and CDI agreed to provide the Service to IIT at discounts of 23% and 24% and allowed IIT in its <u>sole discretion</u> to distribute the Service to its retailers at a discount between 16% to 20%.  The difference between the retailer's discount and IIT's discount was to be paid to IIT by CDI and IDT within 30 days of earning the payment.  As an example, if IIT provided a 24% discounted Service to a Retailer at 16%, CDI and IDT paid IIT 8% on the sale of the Service (i.e., 24%–16%=8%).

20.    The Agreement provided that CDI or IDT would also pay IIT commissions on customer sales and charges within IIT's distribution network, and specifically stated in part that:

    a.    IIT would receive five percent (5%) monthly commissions on amounts customers purchased onto their accounts, where such customer accounts were established with a retailer in IIT's Distributor's Network[2] and that such payments were due thirty (30) days after the month such commissions were earned. (Agreement ¶¶ 1(e), 4.5.)[3]

    b.    IIT would receive two percent (2%) commissions for "International Mobile Top-Up" recharge[4] sold by retailers in IIT's Distributor's Network, and one percent (1%) commissions for Domestic Mobile re-charges[5] generated in IIT's

---

[2] The Agreement defined Distributor's Network as "an account with a corresponding identification number identifying the Retailers comprising Distributor's distribution channel for purposes of directing Commissions . . . and the monitoring of sales activity."  Agreement, ¶3.

[3] Retailers would receive ten (10%) monthly commissions of the value of any customer recharge via online purchase or IVR (customer using his/her own phone to purchase calling time) provided the customer account was established via such retailer.  (Agreement ¶¶1(e), 4.6).

[4] The International Mobile Top-Up recharge allowed a U.S. resident to put money on a family member's mobile phone in a foreign country.

[5] The Domestic Mobile re-charge allowed U.S. customers to prepay for up to 30 days of Service.

Distributor's Network; and that such payments were due thirty (30) days after the month such commissions were earned. (Agreement ¶ 4.7.)

21.     CDI agreed, among other things, to reimburse IDT for certain promotional and travel costs and cost of website video used to provide the Service, to use its best efforts to provide leads to IIT, and to provide IIT the right to participate in and receive economic benefits of applicable IDT Bonus Programs. (Agreement ¶ 4.8.)

22.     Under the Agreement, CDI and IDT agreed to provide IIT with access to sales and commissions records necessary to show commission amounts that IIT and its retailers within its Distributor's Network are entitled to receive under the Agreement. (Agreement, ¶4.95).

23.     The Agreement stated as follows with regard to the parties' working relationship:

> Each Party agrees that it shall perform its duties, obligations, and services hereunder as an independent contractor and not as the agent, employee, or servant of the other Party. Neither Party, nor any person employed or furnished by such Party, shall be deemed the agent, employee, or servant of the other Party.

(Agreement ¶ 6.)

24.  The Agreement stated as follows with regard to Point of Sales ("POS")[6] Materials (*i.e.,* "signs, displays, decals, training manuals and other marketing or promotional materials authorized by CDI and IDT for use by Distributor to provide and support the salability of the Service") (Agreement ¶ 1(f)):

> Distributor shall provide to Retailers that are credited to Distributor's Network any POS materials provided by CDI. Distributor shall direct Retailers to prominently display any and all POS Materials provided by CDI at Retailers' location. Any marketing or promotional materials not provided by CDI shall be at Distributor's expense, unless provided for herein or otherwise agreed in writing by CDI. Any such marketing or promotional materials and any other use by Distributor of CDI's Marks (as hereinafter defined) shall be subject to CDI's prior written approval, which approval may be withheld in their sole discretion.

(Agreement ¶ 7.)

25.  Pursuant to the Agreement, IIT acknowledged that it would not acquire proprietary or other rights in the Service and that title and ownership of the Service belonged to CDI.  (Agreement ¶ 9.)  IIT did not acquire or have access to CDI or IDT's proprietary information or trade secrets.

---

[6] Although CDI and IDT were to provide IIT the POS materials, CDI and IDT refused to provide IIT the POS materials, which prevented IIT from providing POS materials to its retailers.

26.    The Agreement provided that the terms and conditions of the Agreement and "proprietary information regarding the Service and its distribution" was confidential and should not be revealed to third parties except "as required by process of law." (Agreement ¶ 11.)

27.    The Agreement contained the following provision concerning "limitation of liability":

> IN NO EVENT SHALL CDI, OR ITS AFFILIATES BE LIABLE TO DISTRIBUTOR OR ANY THIRD PARTY IN ANY RESPECT FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL EXEMPLARY, RELIANCE OR PUNITIVE DAMAGES, WHETHER IN TORT, CONTRACT OR PRODUCT LIABILITY, NOR SHALL CDI OR ITS AFFILIATES BE LIABLE FOR ANY LOSS OF PROFITS, REVENUE, DATA, GOODWILL, BUSINESS OPPORTUNITIES OR ANY OTHER COMMERCIAL DAMAGE OF ANY KIND OR NATURE WHATSOEVER, CDI'S LIABILITY WITH RESPECT TO THE SERVICE PROVIDED HEREUNDER SHALL BE LIMITED TO CREDITING OF CUSTOMER ACCOUNTS FOR SERVICES PAID FOR BUT NOT RECEIVED.
>
> _HOWEVER, NOTHING IN THIS PROVISION SHALL RELIEVE CDI FROM ANY LIABILITY FOR ANY LOSS OR DAMAGES CAUSED BY ANY FAILURE TO PROVIDE THE DISCOUNTS, SUPPORT, OR PAYMENTS DUE HEREUNDER, AS SPECIFIED IN SECTION 4 ABOVE_.

(Agreement ¶ 12 (emphasis added).)

28.    The Agreement's termination provisions stated as follows:

> 13.1 This Agreement may be terminated by CDI _only upon the occurrence of any of the following_: (a) if Distributor shall be declared insolvent or bankrupt; (b) _if Distributor_

*breaches this Agreement which breach is not cured within* *fifteen (15) days of notice thereof to Distributor*; or (c) within thirty (30) days after a final determination by any governmental authority with jurisdiction over the parties that the substance or purpose of this Agreement is contrary to existing laws, rules or regulations.

13.2 In the event this Agreement is properly terminated by CDI for breach by Distributor (pursuant to Section 13.1 above), then Commissions otherwise payable to Distributor for Customer and Retailer activity within such Distributor's Network and Distributor's exclusive rights to Commissions earned via Distributor's Network, *shall continue for twelve* *(12) months from the date of termination*. After twelve (12) months, the Distributor's Network and Distributor's right to Commissions shall then terminate.

. . . .

(Agreement ¶ 13 (emphasis added).)

29.     The Agreement contained the following representations, warranties, and covenants provision:

Each Party represents, warrants, covenants and agrees that it will perform its obligations under this Agreement in accordance with all applicable federal, state and local laws, rules and regulations. Each party represents and warrants that it is authorized to enter into and fully perform its respective obligations under this Agreement. Distributor covenants that it will: (i) conduct business in a manner that reflects favorably at all times on the Service and the good name, goodwill and reputation of the BOSS Revolution brand, CDI, and IDT; (ii) avoid deceptive, misleading or unethical practices that are or might be detrimental to the marketing and provision of the Services, the BOSS Revolution brand, CDI, and IDT (iii) make no false or

>misleading representatives with regard to the Service, the BOSS Revolution brand, CDI, or IDT; (iv) not publish or employ, or cooperate in the publication or employment of, any misleading or deceptive advertising material with regard to the Service, the BOSS Revolution brand, CDI, or IDT; and (v) make no representations, warrants or guarantees to customers with respect to the specifications, features or capabilities of the Service that are inconsistent with the POS Materials distributed by CDI or IDT.

(Agreement ¶ 14.)

30.     The Agreement proports to contain the following "Non-Compete; Non-solicitation" provision:

>During the term of this Agreement and for three (3) years from the termination or expiration of this Agreement, _Contractor_[7] [an undefined term not used anywhere else in the Agreement] will not, directly or indirectly, either individually or as a partner, officer, director, manager, Contractor, employee, consultant or otherwise, either for himself or for any person or entity other than CDI: (a) engage in any activity competitive with the business of CDI or be interested in any business similar to or in competition with CDI; (b) call on, solicit, or otherwise attempt to establish any business relationship with any person or entity which was, during the term of the Contractor's contract with CDI, a customer or client of CDI; or (c) solicit, recruit or encourage any of CDI's other contractors, employees or Contractors to leave their employment or end their contractual relationship with CDI.

(Agreement ¶ 15 (emphasis added).)

---

[7] The Agreement clearly defines Mr. Abdi and IIT as the "Distributor." (Agreement, Introduction paragraphs). The Definitions section of the Agreement does not define a "Contractor." (Agreement, ¶1).

**B.** **Consistent with Mr. Dieter's objective, IIT Developed a Broad Network of Retailers, 90% of whom were African immigrants and who Serviced a Predominately African Customer Population, Which Generated Significant Revenues for CDI and IDT**

31.     IIT took Mr. Dieter's directive to heart and focused his marketing and business development efforts on selling the Service to African-owned retail stores or retailers that serviced a large population of African customers.

32.     The retailers in IIT's broad network sold the Service to their customers, which generated significant revenues for CDI and IDT.  In fact, IIT generated the following revenue for CDI and IDT: $4,428,576.00 in 2013; $4,074,211.24 in 2014; and $3,837,122.94 in 2015.[8]

33.     IIT's Distributor's Network under the Agreement included approximately 450 retailers in the U.S.[9], and entailed millions of accounts of customers purchasing and using the Service products and services as a result of IIT's efforts establishing and cultivating relationships with retailers. IIT's Distributor's Network also consisted of over 500 retailers in Canada and their corresponding customer accounts.

---

[8] IIT's sales of the Service continued to grow, but IIT no longer has access to CDI's records to obtain sales in subsequent years.

[9] IIT has retailers in its Distributor's Network from the states of New York, Boston, Maine, California, Vegas, Colorado, Nebraska, Kansas, Missouri, Iowa, Minnesota, Illinois, Wisconsin, South Carolina, Texas and Ohio.

34.     At his expense, Mr. Abdi hired individuals to promote the Service in various retail stores, provided customer to load $1.00 of the Service to ensure customers understood the Service, to use it more frequently and to have them promote the Service to their friends and family.

35.     At all times, Abdi and IIT performed all other obligations under the Agreement by, among other things (i) maintaining confidentiality of the terms and conditions of the Agreement; and (ii) conducting business in a manner that reflected favorably at all times on the Service, CDI, and IDT.

**C.     Mr. Dieter's Promises Concerning Commissions for Developing and Assisting in Developing Leads**

36.     In discussions that took place prior to and continued after the parties entered into the Agreement, Mr. Dieter promised Mr. Abdi that IIT would receive commissions from retail accounts and subsequent customer accounts for all leads IIT developed or assisted in developing.

37.     IIT and Mr. Abdi relied upon CDI's promises by spending significant resources in Colorado and other states developing leads for retailers who expressed interest in selling the Service or whom Mr. Abdi believed were optimal candidates for selling the Service.

38.     African retailers and retailers servicing a large African customer population for whom Mr. Abdi introduced the Service (a "Lead"), would call CDI

or IDT after Mr. Abdi introduced the Service to them and sign up for the Service. CDI initially provided IIT a few Leads, but once the Leads began to grow, CID and IDT refused to provide the Leads to IIT, but told the Lead that CDI worked with IIT and then opened accounts up for the retailer under CDI and not IIT, even though Mr. Abdi generated the Lead

39.     CDI and IDT also refused and failed to provide IIT commissions from all retail accounts and subsequent accounts for Leads that IIT developed or assisted in developing.

**D.**     **CDI Breached Its Obligations Under the Agreement and Interfered With IIT's Contractual Relationships With Retailers**

40.     After years of Mr. Abdi and IIT spending its own revenues to promote the Service to African retailers and retailers servicing large African customer bases, IIT developed a significant distribution business for the Service and IIT ranked first or second of CDI's distributors.

41.     IIT at its peak had over 950 retail stores in its Distributor's Network, all of which had corresponding customers (most of whom were African), and CDI paid IIT between $195,000.00 and $225,000.00 annually in commissions on IIT's $3.8 million to $4.4 million annual sales of the Service.

42.     Upon information and belief, CDI and IDT realized that IIT and Mr. Abdi over the years built a significant African-based retail and customer market,

achieving Mr. Dieter's objective, and CDI and IDT decided they no longer needed Mr. Abdi or IIT to develop or maintain the African market for the Service.

43.     In an effort to cut its expenses of paying large commissions to IIT, CDI and IDT conspired and agreed to cut Mr. Abdi and IIT out of the market, with an ultimate goal of stealing IIT's Distributor's Network and terminating IIT's Agreement.

44.     In furtherance of their scheme to steal IIT's substantially developed African-based Distributor's Network, CDI and IDT began a series of campaigns directed towards retailers in IIT's Distribution Network and also claiming that IIT breached the Agreement and threatening IIT with litigation for the alleged breaches.

**E.     Defendants' Campaigns to Steal IIT Distributor's Network**

45.     One CDI and IDT campaign focused on calling directly upon IIT's retailers who were being promised the Service by IIT at a lower revenue, and telling them that although IIT was providing the Service to them at a lower rate, for example 16%, they could get the Service for 20%, which caused some retailers to become upset with IIT and demanded that the Service be provided at a higher percentage, causing IIT to receive a lower percentage from CDI.

46.    CDI and IDT also lowered the percentage IIT's retailers received for the Service in CDI's computer system and approached retailers, showed them the lower percentage in the CDI computer and tried to convince IIT's retailers that IIT was not truthful in providing them the Service at the higher percentage. CDI's and IDT's campaign to try to convince IIT's Retailers that IIT was cheating them on their percentage caused IIT's retailers to question Mr. Abdi/IIT and required IIT to spend significant time trying to convince the retailers that they had always received the correct, higher percentage for the Service and that CDI and IDT only recently changed the percentage in their computer system in an effort to turn the retailers against IIT.

47.    CDI and IDT previously provided IIT a promotional code to give to retailers to provide a discount to the retailer's customers who purchased the Service, but CDI and IDT stopped providing IIT the promotional code and, knowing IIT could no longer provide retailers in its Distributor's Network the promotional code, CDI and IDT approached retailers in IIT's Distributor's Network, told them that they would provide them the promotional code and raised questions in the retailer's minds about why IIT did not provide them the promotional code.

48.    CDI's and IDT's campaigns to steal IIT's Distributor's Network continued with CDI and IDT opening new accounts for retailers in IIT's Distributors' Network with different account numbers that did not report the retailer's usage of the Service to IIT or provide IIT any commissions from the retailer or its corresponding customers, even though IIT spent its time and resources developing the retailer and its customers use of the Service.

49.    Upon information and belief, CDI and IDT (i) modified their distribution model and decided to distribute the Service products and services directly to retailers and (ii) agreed to drive IIT out of business by taking IIT's retail accounts and their corresponding customer accounts from IIT to eliminate CDI having to pay IIT commissions.

**F.    <u>CDI's and IDT's Breach of Contract Campaign Against IIT</u>**

50.    On August 24, 2015, CDI's legal counsel sent IIT a letter alleging breaches of the Agreement for IIT not using its best efforts to promote, market and distribute the Service and not conducting business in a favorable manner claiming IIT disparaged the Service, IDT or CDI.  The letter gave IIT 15 days to cure the alleged breaches.

51.    On September 9 and 15, 2015 IIT's counsel responded to CDI's letter and disputed the allegations, sought clarification of the alleged breaches, but

ensured CDI that if it provided more specifics about the alleged breaches IIT would remedy them.

52.    On September 23, 2015, CDI's counsel responded by referring to IIT's decline in its then current sales compared to prior years' sales as the reason IIT was not using its best efforts to promote the Service, but provided no specifics regarding IIT's alleged disparaging statements about the Service, CDI or IDT.  CDI indicated that it did "not desire to terminate its relationship with" IIT.

53.    On January 11, 2016, CDI advised IIT about an "INACTIVE Retailer Campaign" "to reduce INACTIVE retailer accounts[10] and increase revenue."

54.    On February 3, 2016, CDI sent an email alleging again that IIT was not using his best effort to promote the Service and claiming, without specifics, that IIT was disparaging CDI, IDT and the Service.

55.    On February 16, 2016, IIT's counsel wrote CDI requesting that it stop unilaterally amending or modifying the Agreement, responding to CDI's alleged breaches by IIT, and requesting an accounting.

56.    Consistent with the Agreement, and because CDI had removed retail accounts from IIT Distributor's Network, the accounting was requested to show

---

[10] INACTIVE retailers were defined as a retailer that "sold less than $300 in the past 90 days, but had more than $300 sales previously."  The Agreement does not include a provision for reducing or removing "INACTIVE" retailer accounts.

the amount of commissions that IIT and its retailers were entitled to receive under the Agreement and specifically was necessary to allow IIT to identify retailers that should have been, but were not, included in IIT Distributor's Network.  CDI never responded to IIT's request for the accounting and never provided IIT an accounting.

57.    In 2017 and 2018, IIT had various telephone and email correspondence with CDI about returning retail accounts removed from IIT's Distributor's Network in the U.S. and Canada.   In total, CDI removed approximately 700 retail accounts, and their corresponding customer accounts, from IIT's Distributor's Network before CDI and IDT terminated IIT's Agreement.

58.    On July 18, 2018, IIT sent a text message to Emilio, Director of the Service telling him that CDI was stealing IIT's retail accounts.  On July 24, 2018, IIT sent an email directly to CDI owner Mr. Dieter asking that he and CDI stop calling IIT's retailers and customers and stop creating new accounts for IIT's retail accounts and their corresponding customer accounts.  IIT demanded the return of those stores to its Distributor's Network and compensation for the money lost in commissions that should have been paid to IIT.

59.     Despite Mr. Dieter's, CDI's and IDT's intentional disruptions to IIT and its business, IIT continued to fulfill its requirements under the Agreement notwithstanding CDI's breach of its obligations under the Agreement.

## G.     CDI Improperly Terminated the Agreement

60.     On or about October 26, 2018, CDI's attorneys sent Mr. Abdi a letter that purported to "provide formal notice to you individually and on behalf of IIT of the termination of the Master Distributor Agreement executed on April 6, 2012 as a result of IIT's multiple breaches of the same." Although CDI claimed in October 26, 2018 letter that IIT breached the Agreement, it provided no specific details concerning an alleged breach that would allow Mr. Abdi and IIT to cure such alleged breach.

61.     In the October 26, 2018 letter, CDI's attorneys advised Mr. Abdi and IIT that "CDI can no longer permit IIT to sell BOSS Revolution products and services on its behalf. The Master Distribution Agreement is terminated effective immediately in accordance with Section 13.1. . . ." CDI's attorneys further stated that "CDI expects Mr. Abdi to refrain from engaging in any activity in competition with CDI, contacting existing retailers, or soliciting CDI employees for the next three years" pursuant to the non-competition provision in the Agreement, and

that "[f]ailure to adhere to this provision will result in immediate action against Mr. Abdi and IIT."

62.     Although CDI purported to terminate the Agreement pursuant to Section 13.1, it did not provide Mr. Abdi or IIT with the required fifteen (15) days' notice of a breach, with an opportunity to cure such breach.

63.     On or about January 2, 2019, CDI's attorneys sent Mr. Abdi a letter (i) threatening to withhold Mr. Abdi's commissions, which were required to be paid for a twelve (12)-month period after a proper termination of the Agreement and (ii) enclosing a "Post-Termination Agreement" in which Mr. Abdi would agree, among other things, that he breached the Agreement and would comply with the restrictive covenants in the Agreement, in exchange for CDI paying Mr. Abdi and IIT the commissions it was and is contractually obligated to pay to Mr. Abdi and IIT under the Agreement.

64.     Mr. Abdi and IIT did not sign the proposed Post-Termination Agreement.

65.     On or about January 15, 2019, CDI's attorneys sent a third letter to Mr. Abdi and IIT, stating in part that CDI was (i) withholding payment of commissions lawfully owed to Mr. Abdi and IIT under the Agreement and (ii) was "placing those commissions into an escrow account."

66.     In November 2018, CDI stopped paying IIT commissions on activity in IIT's Distributor's Network, in breach of the Agreement.

67.     Upon information and belief, Mr. Dieter, CDI and IDT have not breached or attempted to terminate distribution agreements with non-black-owned distributors and have not attempted to destroy the distribution businesses of non-black-owned distribution businesses.

68.     Upon information and belief, neither Mr. Dieter, CDI nor IDT have interfered with business relationships and contracts of non-black owned distribution businesses, like they did with IIT.

**H.      CDI's Conduct Caused Damages in Excess of $3 Million Dollars**

69.     Before CDI and IDT's unlawful conduct, IIT was projected to generate more than $250,000.00 in Commissions revenue in 2018 pursuant to the Agreement, with total revenue in excess of $750,000.00 over the next three years.

70.     CDI and IDT have not paid IIT in commissions earned in its Distributor's Network and for retailers improperly removed from the Distributor's Network, which amount, upon information and belief, exceed $250,000.00.

71.     As a result of Defendants' correspondence and threats of litigation, IIT declined to engage in competitive activity with CDI, contact retailers in IIT's

Distributor's Network or further cultivate its Distributor's Network for other business purposes, even though IIT and Mr. Abdi had numerous opportunities to take the Distributor's Network, and the corresponding customers, to other companies that would pay IIT a higher percentage for distributing products similar to the Service.

72.   As a result of CDI's breaches of the Agreement, all at the instruction and direction of Mr. Dieter; Mr. Dieter's, CDI's and IDT's interference with IIT's retailer business and contractual relationships; and the destruction of IIT's Distributor's Network and the threat of litigation, IIT lost in excess of $3 million . Mr. Dieter, CDI and IDT treated Mr. Abdi in the manner described above because he is a black African man who is Muslim, and they intentionally breached the Agreement with IIT and interfered with IIT's retailer business and contractual relationships because of Mr. Abdi's color and the fact that he operated IIT, a successful black-owned business.

## IV.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Breach of Contract/Willful and Wanton Breach of Contract

73.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

74.    Mr. Abdi and IIT entered into a valid and enforceable Agreement with CDI.

75.    Mr. Abdi and IIT performed all duties and obligations under the Agreement by, among other things: (i) establishing a broad network of retailers to sell the Service products and services to its customers, which generated significant revenues for CDI and IDT; (ii) maintaining confidentiality of the terms and conditions of the Agreement; and (iii) conducting business in a manner that reflected favorably at all times on the Service, CDI, and IDT.

76.    Mr. Dieter and CDI materially breached the Agreement and specifically:

a.    Breached paragraph 13.1 of the Agreement by terminating or purporting to terminate the Agreement (1) when neither IIT nor Mr. Abdi breached the Agreement; and (2) without giving

IIT and Mr. Abdi at least fifteen (15) days' notice to permit IIT and Mr. Abdi an opportunity to cure a purported breach.

b.  Breached paragraph 13.2 of the Agreement by failing to pay IIT customer and retailer activity commissions on IIT's Distributor's Network, which were and are payable for a twelve (12) month period after a lawful termination of the Agreement.

c.  Breached paragraphs 3 and 4 of the Agreement by improperly removing IIT's retail accounts and corresponding customer accounts from IIT's Distributor's Network when such accounts were contractually required to remain in IIT's Distributor's Network for an indefinite period, by failing to properly pay IIT residual income from IIT's retail accounts and corresponding customer accounts, and by failing to re-assign such accounts to IIT's Distributor's Network when and if they met the "Loading" and "Top-Up" activity requirements after being improperly removed.

d.  Breached paragraph 4.1 of the Agreement by failing to provide the Service to IIT at contractually-required discounted rates.

e.  Breached paragraph 4.8 of the Agreement by failing to: (i) "use best efforts to provide leads" to IIT; (ii) reimburse IIT for costs of its website videos obtained and used to explain the Service; (iii) reimburse IIT for all travel costs incurred during the first three months of the Agreement; (iv) provide IIT the right to participate in and receive economic benefits from applicable IDT programs; and (v) paying or otherwise reimbursing IIT for the costs of all store promotions it conducted during the first three months of the Agreement.

f.  Breached paragraph 4.95 of the Agreement by failing to provide IIT an accounting of records necessary to show the amount of commissions that IIT and retailers within its Distributor's Network are entitled to receive under the Agreement.

77.     Mr. Dieter directed CDI's purposeful conduct and breaches to ensure they were done heedlessly and recklessly and without regard to the consequences and rights of Mr. Abdi and IIT.

78.     Mr. Dieter and CDI's conduct constitutes a willful and wanton breach of the Agreement.

79.     As a direct and proximate result of Mr. Dieter's and CDI's willful and wanton breach of the Agreement, Mr. Abdi and IIT have suffered injuries, economic damages, non-economic damages, and losses in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### Tortious Interference with Contract and Business Expectancy

80.     Plaintiffs incorporate the preceding allegations as if fully in this paragraph.

81.     IIT entered into contractual relationships and had prospective business relations with IIT's retailers to distribute the Service, pursuant to and in furtherance of IIT's Agreement with CDI.

82.     Mr. Dieter, CDI and IDT knew of IIT's contractual relationships and/or prospective business relations with retailers to distribute the Service.

83.    Mr. Dieter directed CDI to intentionally and improperly interfered with IIT's contractual relationships and/or prospective business relations with retailers by, among other things:

a.    Providing promotional/discount codes directly to IIT's retailers without providing such promotional/discount codes to IIT and contrary to the terms of the Agreement.

b.    Opening new retail accounts for retailers in IIT's Distributor's Network, contrary to the terms of the Agreement, thereby removing the retailers from IIT's Distributor's Network and diverting IIT's commissions and revenue from such retailers (and such retailers' customers) to CDI and/or other distributors.

c.    Taking leads that IIT identified and developed by telling such leads that CDI and IIT were the same company, and then signing the retailer under a CDI account number that did not credit revenue or commissions to IIT.

84.    As a result of Mr. Dieter's, CDI's and IDT's intentional and improper actions, Defendants induced retailers from pursuing or continuing business relationships with IIT and prevented IIT from acquiring or continuing its business

relations with retailors, and the retailers with whom IIT had contractual relationships breached their contractual relationships with IIT.

85.     Defendants' conduct was intentional and improper and constitutes tortious interference with contract and business expectancy.

86.     As a direct and proximate result of Mr. Dieter's, CDI's and IDT's tortious interference with contract and the on-going business relationship, Plaintiffs have suffered injuries, damages, and losses in an amount to be proven at trial.

**THIRD CLAIM FOR RELIEF**
**Declaratory Judgment Invalidating Non-Competition and Non-Solicitation Provisions**

87.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

88.     This Court has the power to declare rights, status, and other legal relations of persons interested under a contract. The Court may declare any question concerning the validity or construction of the rights, status, or legal relations of the parties under a contract.

89.     This case presents a real, present, and justiciable controversy concerning the rights of the contracting parties under the Agreement and the validity of a restrictive covenant under C.R.S. § 8-2-113. Declaratory relief is

necessary or favorable to allow certainty, avoid accruable damages, and to adjudicate Plaintiffs' rights.

90.    Plaintiffs are entitled to a declaration from the Court that the restrictive covenants found in Paragraph 15 of the Agreement are not enforceable against Plaintiffs because the restrictive covenants purport to apply to "Contractor"—an undefined term in the Agreement—and not to Mr. Abdi or IIT.

91.    Plaintiffs are entitled to a declaration from the Court that the restrictive covenants found in Paragraph 15 of the Agreement are unenforceable and void under Colorado law, and specifically are unlawful under C.R.S. § 8-2-113, because, among other things:

   a.    The restrictive covenants unlawfully use force, threats, or other means of intimidation to prevent Plaintiffs from engaging in their lawful distribution business.

   b.    The restrictive covenants do not fit within any exception to the limitations on restrictive covenants as set forth in C.R.S. § 8-2-113(2).

   c.    Neither CDI nor IDT provided IIT any trade secrets or conditional proprietary information as part of the Agreement and the restrictive covenants found in Paragraph 15 of the

Agreement do not have the purpose of protecting CDI or IDT's purported trade secrets.

d.   The restrictions set forth in paragraph 15 of the Agreement are not reasonably limited in scope to protect CDI's or IDT's purported trade secrets, particularly because IIT was not a competitor of CDI or IIT, which were and are in the business of providing the Service to distributors such as IIT, which distributes the Service to retailers for resale to customers.

92.   Therefore, Plaintiffs are entitled to declaratory judgment under C.R.S. §§ 13-51-101, *et seq.*

**FOURTH CLAIM FOR RELIEF**
**Violation of the Colorado Antitrust Act, C.R.S. § 6–4–104 and Section 1 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, *et seq.***

93.   Plaintiffs incorporate the preceding allegations as if they were fully set forth in this paragraph.

94.   Mr. Dieter directed CDI to conspire with IDT to drive IIT out of business by taking IIT's Distributor's Network of retailers and their corresponding customer accounts from IIT to eliminate CDI having to pay IIT commissions under the Agreement.

95.   As a direct and proximate cause of Defendants' agreements in violation of the Colorado Antitrust Act and Sherman Antitrust Act, Plaintiffs have

suffered and continue to suffer injuries and damages of the type these Acts were designed to prevent and the injuries flow directly from that which makes the co-conspirators' conduct unlawful.

96.     Damages to Plaintiffs resulted from Defendants : (i) terminating or purporting to terminate IIT's Agreement when IIT did not breach the Agreement and was not given fifteen (15) days' notice and an opportunity to cure a purported breach; (ii) failing to pay IIT commissions earned for activity in IIT's Distributor's Network for an indefinite period or, alternatively, for a period of twelve (12) months after a lawful termination of the Agreement; (iii) removing IIT's Retail Accounts and corresponding customer accounts from IIT's Distributor's Network when those accounts were to remain in IIT's Distributor's Network for an indefinite period; (iv) failing to properly pay IIT residual income from IIT's retail and customer accounts removed from its Distributor's Network and failing to re-assign those accounts to IIT's Distributor's Network once they met the "Loading" and "Top-Up" activity requirement after being improperly removed; (v) failing to provide the service to IIT at the discounted rates provided for in the Agreement; (vi) failing to "use best efforts to provide leads" to IIT; (vii) failing to reimburse IIT for costs of its website videos obtained and used to explain the Service; (viii) failing to reimburse IIT for all travel costs incurred

during the first three months of the Agreement; (ix) failing to provide IIT the right to participate in and receive economic benefits from applicable IDT bonus programs; (x) failing to pay or otherwise reimburse IIT for the costs of all store promotions it conducted during the first three months of the Agreement; (xi) providing promotional/discount codes directly to IIT's retailers without providing the promotional/discount codes to IIT, in an effort to turn IIT's retailers against IIT for the purpose of CDI dealing directly with IIT's retailers; (xii) opening new retail Accounts for IIT's retailers thereby removing the retailer from IIT's Distribution Network and diverting IIT's commissions and revenue from the retailer and its customers to CDI; and (xiii) taking IIT's leads, identified and developed by IIT in various states where IIT opened the market for selling the Service, by telling IIT's leads that CDI and IIT are the same company, but then signing the retailer up under a CDI account number that did not credit revenue or commission to IIT.

97.    As a direct and proximate result of Mr. Dieter's, CDI's and IDT's violations of the Colorado Antitrust Act and the Sherman Antitrust Act, Plaintiffs have suffered injuries, damages, and losses in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**Conversion**

98.    Plaintiffs incorporate the preceding allegations as if those allegations were fully set forth in this paragraph.

99.    With the requisite intent, Defendants, IDT and CDI, exercised dominion and control over property and other items of value that belonged solely to Plaintiffs.

100.   Plaintiffs did not grant IDT or CDI permission to exercise dominion and control over Plaintiffs' property.

101.   Plaintiffs have suffered damages in an amount to be proven at trial as a proximate cause of IDT and CDI's exercise of dominion and control over Plaintiffs' Property.

**SIXTH CLAIM FOR RELIEF**
**Civil Theft**

102.   Plaintiffs incorporate the preceding allegations as if they are fully set forth herein.

103.    Section 18-4-405 provides that:

> All property obtained by theft, robbery, or burglary shall be restored to the owner, and no sale, whether in good faith on the part of the purchaser or not, shall divest the owner of his right to such property. . . . In any such action, the owner may recover two hundred dollars or three times the amount of the actual damages sustained by him, whichever is greater, and may also recover costs of the action and reasonable attorney fees . . . .

104.   IDT and CDI have taken property that belongs to Plaintiffs without returning the authority or claim of right.

105.   IDT and CDI took Plaintiffs' property with the intent to permanently deprive Plaintiffs of their property.

106.   Plaintiffs suffered damages in an amount to be proven at trial.

### SEVENTH CLAIM FOR RELIEF
**Breach of Fiduciary Duty**

107.   Plaintiffs incorporate the preceding allegations as if fully set forth in this paragraph.

108.   IDT and CDI were acting as Plaintiffs' fiduciary in preserving records for Plaintiffs' commissions and in collecting amounts from retailers and from customers to that would ultimately be paid to Plaintiffs as commissions.

109.   IDT and CDI breached their respective fiduciary duties to Plaintiffs when they failed to remit commissions collected on Plaintiffs' behalf to Plaintiffs.

110.   Plaintiffs have suffered damages because of IDT and CDI's breaches.

111.   IDT and CDI's breaches were the proximate cause of Plaintiffs' damages.

### EIGHTH CLAIM FOR RELIEF
**Civil Conspiracy**

112.   Plaintiffs incorporate the preceding allegations as if those allegations were fully set forth in this paragraph.

113. IDT and CDI engaged in a scheme whereby they planned to cut out Plaintiffs from the sales process and retain Plaintiffs' clients for themselves.

114. IDT and CDI's object to be accomplished was to deny Plaintiffs access to money owed to Plaintiff while retaining Plaintiffs' clients.

115. IDT and CDI agreed on the object to be accomplished.

116. IDT and CDI each undertook an intentional unlawful overt act in an effort to accomplish their goals.

117. Plaintiffs suffered damages proximately caused by IDT and CDI conspiracy.

## NINTH CLAIM FOR RELIEF
### Promissory Estoppel

118. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

119. Mr. Dieter and CDI promised IIT that it would receive commissions from retail accounts and their subsequent customer accounts for all leads IIT developed.

120. Mr. Dieter and CDI intended, or at least reasonably should have expected, that their promises and representations would induce action by IIT and Mr. Abdi to expend resources to develop leads.

121.   IIT and Mr. Abdi actually and justifiably relied upon Mr. Dieter's and CDI's promises by spending significant resources in Colorado and other states developing leads for retailers who expressed interested in selling the Service or whom IIT identified as optimal candidates for selling the Service.

122.   IIT's and Mr. Abdi's actual and justifiable reliance on Mr. Dieter's and CDI's promises resulted in Plaintiffs' detriment and caused Plaintiffs to suffer legal injury in an amount to be determined at trial.

123.   CDI's promises must be enforced to prevent injustice.

### TENTH CLAIM FOR RELIEF
### Demand for Accounting

124.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

125.   The Agreement requires CDI and IDT, upon request, to provide IIT "with such other records as are necessary to show the amount of Commissions that Distributor and Retailers within Distributor's Network are entitled to receive under this Agreement."  (Agreement, ¶4.95).

126.   Despite IIT's prior demands for an accounting, CDI and IDT refused to provide the necessary information to IIT.[11]

---

[11] Mr. Dieter and CDI's refusal to provide IIT the prior requested accounting is also a breach of the Agreement.

127.   IIT requests that the Court order CDI and IDT to provide the necessary information for an accounting as follows:

a.   Complete list of every retailer and individual seller, and the corresponding customer accounts, CDI or IDT has ever included in IIT's Distributor's Network from April 6, 2012 to present;

b.   Complete list of every retailer and individual seller, and corresponding customer accounts, ever removed from IIT's Distributor's Network, including retailers or individual sellers for whom CDI or IDT assigned new account numbers, from April 6, 2012 until present ("Removed Retailers");

c.   Sales report of every Removed Retailer, as defined above, that is sufficient in content to determine whether Section 3 of the Agreement applies;

d.   Sales report of every Removed Retailer, as defined above, to whom Section 3 of the Agreement does not apply as it relates to removal from IIT's Distributor's Network, that is sufficient in content to allow calculation of commissions owed to IIT;

e.    A complete copy of the "rules for distributors" discussed in a January 11, 2016 email to IIT; and

f.    A complete list of all retailers in IIT's Distributor's Network for whom CDI ever assigned to anyone besides IIT and/or created a new account number.

128.   Without an accounting, as agreed to by CDI and IDT, IIT and Mr. Abdi are damaged in that they are unable to fully determine the magnitude of IIT's and its retailer's commissions and the commissions from the retailer's corresponding customers.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Abas Abdi and IIT, Inc. respectfully request that the Court enter judgment in their favor and against Defendant on Plaintiffs' claims as follows:

A.    Specific performance in the form of an Order (i) stating that the Agreement remains active and that any attempt by CDI in the future to terminate the Agreement must comply with the terms and conditions of the Agreement concerning termination; and (ii) directing CDI to pay all commissions due to Plaintiffs under the Agreement indefinitely or, in the event of a lawful termination, for a twelve-month period after such termination.

B.      Damages in an amount to be proven at trial (i) for all commissions owed to Plaintiffs pursuant to the Agreement, with pre- and post-judgment interest, and (ii) to compensate for Plaintiffs' additional losses and continued losses resulting from CDI's actions toward Plaintiff.

C.      Punitive and exemplary damages for Mr. Dieter's, CDI's and IDT's intentional acts in an amount sufficient to deter them from any further wrongdoing in violation of federal and Colorado law, in an amount to be determined at trial.

D.      A declaration providing that the restrictive covenants in Paragraph 15 of the Agreement do not apply to Plaintiffs and, if they do, declare that they are unenforceable and void under Colorado law.

E.      An accounting as described in the Complaint; and

F.      Such other and further relief as the Court deems just and proper.

Dated this 2nd day of June  2020.

WILLIAMS LLP

By: */s/ T. Edward Williams, Esq.*
     T. Edward Williams
     7 World Trade Center
     250 Greenwich Street 46th FL.
     New York, New York 10007
     Tel: (212) 634-9106
     Email: Edward.williams@wmsintl.com
     *ATTORNEYS FOR PLAINTIFFS*

<u>Plaintiffs' Address:</u>
1602 S. Parker Road, Unit 112
Denver, Colorado 80231